# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| [UNDER SEAL], | Case No: 17 Civ. 2114 (GBD) |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | |
| [UNDER SEAL], | **<u>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)</u>** |
| Defendants. | |

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER INTO PACER**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES, *ex rel*. DEREK YEE, | Case No: 17 Civ. 2114 (GBD) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| SORKINS RX LTD., d/b/a CAREMED PHARMACEUTICAL SERVICES, APOGEE BIO-PHARM LIMITED LIABILITY COMPANY, COPILOT PROVIDER SUPPORT SERVICES, INC., NUAMAN TYYEB, and MOBY KAZMI, | <u>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**</u> |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff-Relator Derek Yee ("Relator"), through his attorneys, on behalf of the United States of America (the "Government"), for his Amended Complaint against Sorkins Rx Ltd. d/b/a CareMed Pharmaceutical Services ("CareMed"), Apogee Bio-Pharm ("Apogee"), CoPilot Provider Support Services, Inc. ("CoPilot"), Nuaman Tyyeb ("Tyyeb"), and Moby Kazmi ("Kazmi") (collectively, "Defendants"), alleges, based on personal knowledge, relevant documents, and related information and belief, as follows:

## I.    <u>Introduction</u>

1.    This is an action to recover damages and civil penalties on behalf of the United States of America for violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. (the "FCA" or the "Act"), and the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

2.    On October 9, 2014, CareMed settled a prior and substantively unrelated FCA action to resolve allegations that it made fraudulent misrepresentations in order to receive prior

2

authorization from insurance plans for certain prescriptions for Medicare beneficiaries. Fifteen days later the Pharmacy Benefit Manager ("PBM") Express Scripts Inc. and Medco Health Services Inc. (collectively, "ESI-Medco"), which manages prescription drug benefits on behalf of many Medicare Part D beneficiaries, removed CareMed from its provider network, citing CareMed's admissions in the FCA settlement.

3.     Because prescriptions from patients covered by ESI-Medco, including Government healthcare beneficiaries, constituted as much as 40% of CareMed's revenues, such a loss would have been catastrophic to CareMed. The company's owners, Tyyeb and Kazmi, therefore scrambled for a way to continue to get paid by ESI-Medco. First, they unsuccessfully sought a temporary restraining order and preliminary injunction in federal court.

4.     When that failed, Tyyeb and Kazmi approached several other specialty pharmacies and offered to send all ESI-Medco patient prescriptions to the pharmacies on two conditions: that the other pharmacy would share the associated revenue with CareMed and would agree not to try to retain those customers if and when CareMed were allowed back on to ESI-Medco's network. Most pharmacies rejected the offer, likely because they realized such an agreement was a clear violation of the FCA and AKS.

5.     However, Apogee, a small specialty pharmacy in New Jersey, ultimately agreed to CareMed's terms. As part of that agreement, CareMed took orders from customers, filled patients' prescriptions, handled and packaged the prescriptions, labeled them with Apogee's prescription label, billed ESI-Medco for the prescriptions using Apogee's National Provider Identifier ("NPI"), and brought the filled, packaged, and labeled prescriptions to Apogee's facility for final shipment to the patient.

6.     CareMed never informed its patient customers, referring physicians, ESI-Medco,

or the Government about this arrangement.

7.      While CareMed was excluded from ESI-Medco, CoPilot, which is also owned and managed by Tyyeb and Kazmi, also directed prescriptions covered by ESI-Medco toward Apogee, without authorization from doctors or patients and in furtherance the kickback agreement between the other Defendants.  Before CareMed was excluded from ESI-Medco, CoPilot had previously directed all prescriptions it could to CareMed without authorization from patients or doctors.

8.      This conduct violates the FCA.  CareMed, at the direction of Tyyeb and Kazmi, knowingly submitted or caused to be submitted false or fraudulent claims for payment for prescriptions for Government healthcare beneficiaries to ESI-Medco using Apogee's NPI, when CareMed was the company actually filling the prescriptions.

9.      CareMed did so because ESI-Medco would not have paid the claims on behalf of the Government if CareMed had submitted them under its own NPI.  Unaware of this situation, the United States ultimately paid for false and fraudulent claims that the United States and ESI-Medco would not have paid or approved had they known the truth about the claims.

10.     Not only does the conduct violate the FCA, it potentially puts patients at risk by masking the true provider of these sometimes highly-controlled and potentially-dangerous medicines.

11.     Defendants' behavior also violated the AKS.  CareMed performed valuable services—including taking orders, filling and billing for prescriptions, printing labels, handling orders, and bringing filled, packaged, and labeled prescriptions to Apogee for final shipping to the customer—in connection with its referrals to Apogee.

12.     By promising to perform and ultimately performing these services, CareMed convinced Apogee to agree not to compete in the future for any of the patients whom CareMed

referred to Apogee, and to share the revenues for the ESI-Medco covered prescriptions.

13.     Thus, at CareMed's and its principals' inducement, Apogee effectively paid CareMed for referrals of patients whose prescriptions were ultimately paid for by the Government. These actions constitute clear violations of the AKS, and therefore the subsequent claims for those referrals are false and fraudulent under FCA.

14.     Defendants' agreement to engage in this pattern of behavior also constitutes a conspiracy actionable under the FCA.

15.     *Qui tam* Relator Derek Yee seeks to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that the Defendants made and the payments it avoided through its fraudulent conduct.

16.     This is also an action by Relator to recover damages for his retaliatory discharge and for other retaliatory actions by Defendants.   During his tenure at CareMed, Relator investigated, reported, and objected to Defendants' fraudulent conduct that violated the FCA. Relator repeatedly complained about these matters to CareMed's senior leaders, including Defendants Kazmi and Tyyeb.  Defendant CareMed retaliated against Relator by terminating his employment in March 2015.  Through its retaliatory actions, Defendant CareMed violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

## II.     Parties and Relevant Non-Party Entities

### A.     Plaintiff/Relator

17.     Derek Yee is a resident of New York City.  He is a former employee of CareMed, where he personally witnessed much of the misconduct alleged herein.

### B.     Defendants

18.     Sorkins Rx Limited is a private limited liability company organized under the laws of New York, with its principal place of business at 1981 Marcus Avenue, New Hyde Park, New

York 11042.  Sorkins operates under the name CareMed.  CareMed's NPI is 1659380772. CareMed is a specialty pharmacy that dispenses high-cost prescription medicines generally for chronic illnesses or those with complicated treatments.  CareMed primarily operates by mail-order, with customers throughout New York, including the Southern District of New York, and across the United States.  On March 16, 2017, PharMerica Corporation acquired CareMed.  At that time, PharMerica was a public corporation.  It has since been taken private by KKR and Walgreens Boots Alliance, Inc.

19.     Defendant CoPilot is a private corporation organized under the laws of New York with principal place of business at the same location as CareMed.  CoPilot provides pre- and post-commercialization support services for pharmaceutical companies and other medical companies.

20.     Defendants Nuaman Tyyeb and Moby Kazmi are co-owners of CoPilot and, at least until its acquisition by PharMerica on March 16, 2017, were co-owners of CareMed.  They are also co-managers of both companies.  On information and belief, they are residents of New York.

21.     Defendant Apogee Bio-Pharm Limited Liability Company is organized under the laws of New Jersey, with its principal place of business at 180 Raritan Center Parkway Suite 101, Edison, New Jersey, 08837.  Its NPI is 1427323534.

C.     Relevant Non-Party Entities

22.     Express Scripts, Inc. ("ESI") is a corporation organized under the laws of the State of Delaware.  ESI is a Pharmacy Benefit Manager for Part D Prescription Drug Plans that manages prescription drug benefits for federal Medicare beneficiaries.

23.     Medco Health Services Inc. ("Medco", and collectively with ESI, "ESI-Medco") is a corporation organized under the laws of the State of Delaware.  Medco is also a Pharmacy Benefit Manager for Part D Prescription Drug Plans.  ESI purchased Medco in 2012.

6

III.     **Jurisdiction and Venue**

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and transact business in the Southern District of New York.

26.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because the Defendants can be found in, and/or transact or have transacted business in, this district.  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this district, and/or maintain employees and offices in this district.  Indeed, much of the misconduct alleged herein occurred within this district.

27.     Although the issue is no longer jurisdictional, the public disclosure provisions of the federal False Claims Act do not bar this suit.  To the extent there has been a public disclosure of the allegations or transactions alleged in this complaint, Relator is an original source of the information on which this complaint is based.  He reported the information to the Government before any public disclosure of the allegations or transactions, has information that is independent of the public disclosure and that information materially adds to any information that the Government may have.

IV.     **Applicable Law**

A.     The False Claims Act

28.     The FCA was originally enacted during the Civil War.  Congress substantially

amended the Act in 1986, 2009, and 2010 to enhance the ability of the United States to recover losses sustained because of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, needed modernization. Congress intended to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

29.     The FCA prohibits knowingly presenting—or causing to be presented—to the federal Government a false or fraudulent claim for payment or approval and knowingly making or using—or causing to be made or used—a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)-(B). The Act also prohibits any conspiracy to commit those acts. *Id.* § 3729(a)(1)(C).

30.     Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. *Id.* § 3729 (a)(1).

31.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). The FCA does not require proof that a defendant specifically intended to commit fraud. *Id.*

32.     The FCA allows any person with information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. Such an action is known as a *qui tam* action, and the individual bringing the suit is called a *qui tam* relator. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the

defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

        B.     <u>The Medicare Voluntary Prescription Drug Benefit Program (Part D)</u>

       33.     Title XVIII of the Social Security Act, commonly known as Medicare, is a federally funded and administered health insurance program, primarily for elderly and disabled persons. Title XIX of the Social Security Act, known as Medicaid, is a federal/state entitlement program that pays for medical assistance for individuals and families with low incomes. The Medicare and Medicaid programs are administered through the Centers for Medicare and Medicaid Services ("CMS"), an operating division of the U.S. Department of Health and Human Services ("HHS").

       34.     Medicare consists of four parts: Hospital Insurance Benefits (Part A), Supplemental Medical Insurance Benefits (Part B), Medicare Advantage (Part C), and the Voluntary Prescription Drug Benefit Program (Part D). Medicare Part A covers inpatient hospital, home health, skilled nursing facility, and hospice care. Medicare Part B covers physician, outpatient hospital, home health, and other services. Medicare Part C was created in 1997, when Congress established the Medicare+Choice program, now known as Medicare Advantage. Congress created Medicare Part D in 2003 through section 101 of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare beneficiaries. Part D provides subsidized access to prescription drug insurance coverage on a voluntary basis to individuals entitled to Part A or enrolled in Part B who pay a premium (also known as "beneficiaries" or "members"). Part D also provides premium and cost-sharing subsidies for low-income enrollees.

       35.     The United States does not pay pharmacies directly for providing covered drugs to Medicare Part D beneficiaries. Instead, the United States pays private companies known as "Part

D plan sponsors" or "Part D sponsors" that contract with CMS.  The sponsors operate Prescription

Drug Plans ("PDPs").  All PDPs must provide enrollees with qualified prescription drug coverage.

42 U.S.C. § 1395w-102; 42 C.F.R. § 423.104.

36.     Part D plan sponsors negotiate drug prices with manufacturers, wholesalers, and

pharmacies, often through pharmaceutical benefit managers ("PBMs"), which are intermediary

companies that deal directly with pharmacies.  The Part D sponsors and/or PBMs contract with

pharmacies that will provide drugs under a prescription drug plan.

37.     CMS pays Part D sponsors through four payment mechanisms: (1) direct subsidies;

(2) low income cost sharing ("LICS") subsidies for low-income beneficiaries; (3) reinsurance

subsidies for catastrophic coverage; and (4) risk sharing payments, which limit a sponsor's risks

and profits.  *See* 42 C.F.R. §§ 423.315, 423.329.  CMS pays each Part D sponsor an advance

monthly payment covering the first three of these mechanisms.  *Id.*  At the end of the payment

year, CMS reconciles advance payments to each Part D sponsor with the sponsor's actual costs,

based at least in part on Prescription Drug Event ("PDE") data that sponsors submit to the federal

Government.  The PDE is therefore a crucial piece of the payment system.

38.     The PDE is an electronic transmission with 37 information fields about a particular

drug-related transaction; one of those fields is the National Provider Identifier of the dispensing

pharmacy.

39.     Generating the PDE involves combining information from pharmacies, PBMs, and

Part D sponsors.  When a pharmacy dispenses drugs to a Part D beneficiary, the pharmacy submits

electronic claims to the Part D sponsor or its PBM.  This claim forms the basis of the PDE.  Plans

then pay pharmacies for the cost of the drug, plus a dispensing fee.  Part D plan sponsors then

notify CMS that a drug was purchased and dispensed through a PDE, relying at least partially on

information from the pharmacy that dispensed the drug for the information in the PDE.

40.     CMS's reconciliation process, relying in large part on PDEs, may lead it to provide additional payments if the Part D sponsor's actual costs were higher than expected, or to recoup payments from the Part D sponsor if those costs were much lower.

41.     PDEs also form the basis of risk-sharing payments, which are based on the degree a plan's allowable costs exceeded or fell below a target amount of the plan's bid. *See* 42 C.F.R. § 423.336.

42.     Given PDE data's central role in this adjustment process, PDEs are material parts of a Part D sponsor's claims to the Government for payment.

43.     CMS also conditions payments to Part D sponsors "upon provision of information to CMS that is necessary to carry out" Part D. *See* 42 C.F.R. § 423.322.  PDEs, and the data they contain, are necessary to carry out Part D because they form the documentary basis of requests for payment for each individual prescription submitted to Medicare under the Part D program.

44.     To act as a plan sponsor and receive payments from CMS, Part D sponsors must contract with CMS.  42 C.F.R. § 423.504.  Each contract is for 12 months and may be renewed. Under the contract, the sponsor agrees to operate its PDP as described in its submissions to CMS and in accordance with Part D statutes, regulations, solicitations, and all other applicable federal statutes, regulations, and policies. *See* 42 U.S.C. § 1395w-112; 42 C.F.R. § 423.505.  The sponsor also must certify that the claims data it submits are accurate, complete, and truthful, and acknowledge that the data are used to obtain federal reimbursement.  42 C.F.R. § 423.505(k)(3). Sponsors must certify in contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act.  42 C.F.R. § 423.505(h)(1).  Part D plan providers may not engage in "false, fraudulent, or abuse activities

affecting the Medicare, Medicaid, or other State or Federal health care programs, including submission of false or fraudulent data."  42 C.F.R. § 423.509(a)(4).

45.     Federal regulations also require Part D sponsors to certify the accuracy, completeness, and truthfulness of PDE claims data submitted to CMS.  *See* 42 C.F.R. § 423.505(k). Specifically, sponsors sign the following certification:

> (1) General rule. As a condition for receiving a monthly payment under subpart G of this part (or for fallback entities, payment under subpart Q of this part), the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

> (2) Certification of enrollment and payment information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.

> (3) Certification of claims data. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.87l(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement …

*Id.*

46.     Compliance with these terms is material to the Government's decision to pay.  To further emphasize the importance of the data, Part D sponsors must annually sign an Attestation of Data Relating to CMS Payment to a Medicare Part D sponsor, which states:

> Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and the Medicare Part D Organization(s) listed above, hereafter referred to as the Part D Organization, governing the operation of the contract numbers listed above, the Part D Organization hereby makes the following attestations concerning CMS payments to the Part D Organization:

The Part D Organization attests that based on its best knowledge, information, and belief, the final Prescription Drug Event (PDE) data that have been submitted to and accepted by CMS as of [date] with respect to the Part D plans offered under the above-stated contract(s) for the dates of service of January 1, [prior year] to December 31, [prior year], are accurate, complete, and truthful and reflect all retroactive adjustments of which the Part D organization has been informed by May 30, [current year]. In addition, the Part D Organization attests that based on best knowledge, information, and belief, the payments that have been made by the Part D organization for the claims summarized by the aforementioned PDE data were made in accordance with the coordination of benefits guidance in Chapter 14 of the Medicare Prescription Drug Benefit Manual and other applicable CMS guidance. The Part D Organization attests that based on its best knowledge, information, and belief as of the date(s) of last successful DIR [Direct and Indirect Remuneration Data] [prior year] data submission(s) via the Health Plan Management System (HPMS) as listed above, the final direct and indirect remuneration data submitted to CMS for the Part D plans offered under the above-stated contract(s) for the [prior] coverage year are accurate, complete, and truthful and fully conform to the requirements in the Medicare Part D program regulations and the Final Medicare Part D DIR Reporting Requirements for [the prior year]. The Part D Organization also certifies that based on its best knowledge, information, and belief as of the date indicated below, all other required information provided to CMS to support the determination of allowable reinsurance and risk corridor costs for the Part D plans offered under the above-stated contract(s) is accurate, complete, and truthful. With regards to the information described in the above paragraphs, the Part D Organization attests that it has required all entities, contractors, or subcontractors, which have generated or submitted said information (PDE and DIR data) on the Part D Organization's behalf, to certify that this information is accurate, complete, and truthful based on its best knowledge, information, and belief. In addition, the Part D Organization attests that it will maintain records and documentation supporting said information. The Part D Organization acknowledges that the information described in the above paragraphs will be used for the purposes of obtaining federal reimbursement and that misrepresentations or omissions in information provided to CMS may result in Federal civil action and/or criminal prosecution.

47.     All Part D sponsors who received payment under Medicare Part D from 2006 through the present submitted this attestation.

48.     Additionally, Part D sponsors must contract with providers, including pharmacies, and "[e]ach and every contract must specify that the related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(4)(iv). Subcontractors must certify that claims data are true and accurate to the best of their knowledge and belief. 42 C.F.R. § 423.505(k)(3).

C.     National Provider Identifiers

49.     NPIs are meant to "improve the … Federal health programs … and the effectiveness and efficiency of the health care industry in general, by simplifying the administration of the health care system and enabling the efficient electronic transmission of certain health information." HIPAA Administrative Simplification: Standard Unique Health Identifier for Health Care Providers, 69 FR 3434.

50.     "Covered entities" must obtain an NPI from the National Plan and Provider Enumeration System.  *See* 45 C.F.R. § 162.408; 45 C.F.R. § 162.406.  A "covered entity" or "covered healthcare provider" is "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by" the federal healthcare laws.  45 C.F.R. § 160.103.  A covered entity must "[u]se the NPI it obtained [] to identify itself on all standard transactions that it conducts where its healthcare identifier is required" and must "[d]isclose its NPI, when requested, to any entity that needs the NPI to identify that covered health care provider in a standard transaction."  45 C.F.R. § 162.410(a)(2) and (3).

D.     The Anti-Kickback Statute

51.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, arose out of Congressional concern that financial inducements can influence health care decisions and result in goods and services being more expensive, medically unnecessary, and harmful to patients.

52.     To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to overutilization or unnecessary care.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

53.     The AKS prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).

54.     The AKS covers any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

55.     Compliance with the AKS is a precondition to both participation as a health care provider in and payment under federal health care programs.  42 U.S.C. § 1320a-7(b)(7).  To establish eligibility and seek reimbursement from the Medicare Program, a provider must enter into a Provider Agreement with CMS.  As part of that agreement, the provider must sign a certification with the following language:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

56.     Similarly, compliance with the federal AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from Government-funded health care programs.

57.     In sum, providers who participate in federal health care programs must comply with and certify that they have complied with applicable federal rules and regulations, including the AKS.

58.     Any party convicted under the AKS must be excluded from federal health care programs (*i.e.*, not allowed to bill for services rendered) for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

59.     Even without a conviction, if the Secretary of the Department of Health and Human Services ("HHS") finds administratively that a provider has violated the AKS, the Secretary may exclude that provider from the federal health care programs for a discretionary period, and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

60.     Pursuant to the Affordable Care Act passed in 2010, any claim submitted to a federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

## V.     <u>Allegations</u>

61.     Defendants violated the False Claims Act in several ways.  First, Defendants caused ESI-Medco, as a Pharmacy Benefit Manager, to submit false data to the Government in its Prescription Drug Events, which form the basis of claims for payment from the United States. Specifically, Defendants knowingly submitted or caused to be submitted claims data that contained Apogee's NPI as the fulfilling pharmacy for numerous prescriptions when, in fact, CareMed filled the prescriptions.

62.     Second, CareMed induced Apogee to offer remuneration in exchange for referrals of patients, including patients covered by federal healthcare programs, in violation of the AKS. CoPilot facilitated this arrangement by directing to Apogee prescriptions covered by ESI-Medco that it would have sent to CareMed but for CareMed's exclusion from ESI-Medco.

63.     In each instance, CareMed, CoPilot, and Apogee, along with Tyyeb and Kazmi, also conspired to violate the FCA.

64.     CareMed also made false statements and material omissions to ESI-Medco, causing it to be reinstated to ESI-Medco's network in or around June 2016.  As a result, since that time

16

CareMed has been able to send prescriptions to ESI-Medco for prescriptions that would not have been filled had ESI-Medco known of CareMed's deception regarding Apogee and its false statements and material omissions.

65.     CareMed engaged in all of this behavior at the direction of and/or through the direct and personal participation in the wrongdoing of its owners, Tyyeb and Kazmi.

66.     During his tenure at CareMed, Relator investigated, reported, and objected to Defendants' fraudulent conduct that violated the FCA.  Relator repeatedly complained about these matters to CareMed's senior leaders, including Defendants Kazmi and Tyyeb.  When Relator cited CareMed's potentially unlawful conduct and explained to Kazmi and Tyyeb that CareMed's actions concerned him, Defendant CareMed immediately terminated Relator's employment in retaliation for his protected disclosures about Defendants' unlawful conduct.

A.     CareMed entered into a Corporate Integrity Agreement in 2014 after it settled a False Claims Act case with the Government.

67.     On October 9, 2014, CareMed settled claims with the Government, New York State, and a *qui tam* relator concerning violations of the FCA.  CareMed admitted in the settlement that company representatives made misrepresentations to receive prior authorization from insurance companies for prescriptions CareMed wanted to fill.  CareMed also admitted to myriad inadequate controls and procedures relating to oversight, training, and auditing.

68.     As part of that settlement CareMed entered into a Corporate Integrity Agreement ("CIA") with the Federal Government's Office of Inspector General of the Department of Health and Human Services ("OIG").

B.     ESI-Medco removed CareMed from its pharmacy network following settlement of the prior FCA action.

69.     Based on relevant court filings, on conversations that he heard in his capacity as a CareMed employee, and his understanding of associated requirements of federal law, Relator

believes and therefore alleges the following information in this section:

70.     On or around May 1, 2007, CareMed entered into a contract called a Provider Agreement to join ESI's pharmacy provider network.  As part of that agreement, CareMed was required to acknowledge that it "must comply with all applicable Federal laws, regulations, and CMS instructions" pursuant to 42 C.F.R. § 423.505(i)(4)(iv).  CareMed also had to certify that it would only submit true and accurate claims data to ESI in accordance with 42 C.F.R. § 423.505(k)(3).

71.     ESI later merged with or acquired Medco and became ESI-Medco, and CareMed's Provider Agreement continued with ESI-Medco.

72.     On October 24, 2014, fifteen days after CareMed settled the allegations in the 2014 FCA matter, ESI-Medco sent a letter notifying CareMed that ESI-Medco would be terminating CareMed's participation in ESI-Medco's pharmacy network effective November 7, 2014.  After several rounds of negotiation, ESI-Medco and CareMed agreed to delay termination through November 18, December 1, and then January 15, 2015.

73.     On January 14, 2015, CareMed filed a complaint requesting injunctive relief, including a temporary restraining order and permanent injunction, against ESI-Medco, prohibiting it from terminating its contract with CareMed.

74.     According to its complaint, CareMed earns at least $100 million in annual revenues from prescriptions filled through the ESI-Medco PBM.  According to CareMed the company would cease operating if it lost the revenue associated with prescriptions filled through ESI-Medco.

75.     ESI agreed to delay terminating CareMed until at least January 20, 2015, to give the court an opportunity to issue an order on the TRO and preliminary injunction request.

76.     The court denied CareMed's request for a TRO and preliminary injunction on January 20, 2015.

77.     CareMed voluntarily dismissed the case against ESI-Medco on February 17, 2015.

78.     Based on conversations with CareMed employees and former employees, including John Witkowski, the former Senior Vice President of Sales at CareMed, and on information described below, Relator believes and therefore alleges that CareMed was removed from the ESI-Medco network on or about January 20, 2015.

79.     Based on conversations with Mr. Witkowski, Relator believes and therefore alleges that CareMed was not reinstated as a specialty pharmacy provider under the network until approximately June 2016.

C.     CareMed's Defendant owners Tyyeb and Kazmi tried to add Apogee as an additional site for dispensing Limited Distribution Drugs by creating a fake purchase agreement.

80.     CareMed derives much of its revenue from Limited Distribution Drugs ("LDDs"). LDDs are generally high-cost drugs that treat conditions affecting a relatively small number of people and often have serious risks.  LDDs are usually closely tracked by pharmaceutical companies and are often subject to heightened federal requirements for Risk Evaluation and Mitigation Strategies ("REMS"), administered by the Food and Drug Administration ("FDA").

81.     For example, Revlimid, an LDD, treats multiple myeloma, a cancer of plasma cells which, without treatment, is usually fatal within a few months.  Fewer than half a million people suffer from the disease worldwide.  As of the date of this Amended Complaint, one year of treatment with Revlimid can cost over $160,000.  The FDA's REMS material for Revlimid imposes requirements on healthcare providers, patients, and pharmacies.  Pharmacies must engage in specific patient counseling to evaluate patient risk before dispensing the drug.

82.     Specialty pharmacies such as CareMed generally must enter contracts

pharmaceutical companies to dispense LDDs.  The contracts are limited to specific physical dispensing locations, so a company with multiple dispensing locations must enter an agreement with the pharmaceutical company for each site.  The contracts also often specify that dispensing pharmacies must follow the FDA's REMS.

83.     For example, CareMed entered into such an agreement with Celgene, which makes Revlimid.  The REMS for Revlimid requires dispensing pharmacies to obtain authorization from Celgene each time it dispenses Revlimid to a patient.

84.     LDDs constitute an outsized portion of CareMed's revenues.

85.     For example, in 2014 only seven percent of CareMed's patients used Revlimid, but the drug accounted for roughly 20% of the company's revenues.

86.     On or about January 21, 2015, Tyyeb and Kazmi asked Relator to inquire with certain limited distribution drug companies what it would take to add additional approved sites from which CareMed could dispense LDDs.

87.     On or about January 22, 2015, Relator spoke to representatives at Pfizer and Genentech regarding adding additional sites to fill CareMed's LDD prescriptions.  The companies' representatives informed Relator that they required certain documentation, including proof of purchase or ownership of any other sites that CareMed wanted to add as an approved site.  Relator conveyed this information to Tyyeb and Kazmi.

88.     Later that day, Mr. Tyyeb sent relator an email, with Mr. Kazmi cc'd, containing four documents, one of which was a purported proof of purchase of Apogee.

89.     The purported proof of purchase is dated January 15, 2015.  The stated purchase price was $250,000.  Relator believes that CareMed may have offered this amount or some other cash amount as additional consideration in furtherance of the kickback agreement described below.

90.     In a meeting held shortly after Relator received the email with the purchase agreement from Tyyeb, Tyyeb and Kazmi both told Relator that he should not tell John Witkowski, the Senior Vice President of Sales and Marketing, or Ty Markey, the IT director, about the purported purchase agreement.

91.     Although CareMed provided a PDF document to Relator on January 22, 2015 purporting to be a purchase agreement for Apogee, it is Relator's current understanding that CareMed never actually purchased Apogee.

92.     Relator now believes and therefore alleges, based on the events described below, that the document was drawn up to trick pharmaceutical companies into thinking that Apogee was owned by CareMed so that Apogee could fill any prescription that CareMed could fill, including lucrative LDD prescriptions.

93.     At the time he received the document, Relator was unaware it was fake.

94.     Misled by Tyyeb and Kazmi, Relator forwarded the false proof of purchase and other requested documents to Pfizer and Genentech on January 23, 2015.

95.     On January 27, 2015, Tyyeb and Kazmi called Relator requesting an update on the request to add Apogee as an additional site.  On that call, Mr. Tyyeb mentioned that CareMed did not actually own Apogee.

96.     Relator found this alarming, because it suggested that CareMed's owners were trying to deceive the pharmaceutical companies.  Relator became concerned that he was being brought into a potentially fraudulent scheme.

97.     The next day, January 28, 2015, Relator had a meeting with other CareMed employees, including Alexis Abella (Executive Liaison and assistant to John Witkowski), Vanessa Mariacher (Human Resources Director), Tim Morin (Assistant Intake Supervisor), Mr. Markey,

and Mr. Witkowski about various issues at CareMed.   At that meeting Mr. Morin and Ms. Mariacher expressed concern regarding Apogee.   Mr. Morin mentioned that many of his team members had also voiced concerns about Apogee.

98.    At or about the time of that meeting, Ms. Mariacher told Mr. Witkowski that she had visited Apogee and that its facility was very small ("the size of a small closet") and that they did their pharmaceutical compounding in the bathroom sink.

99.    Later on January 28, 2015, Tyyeb, Kazmi, and Relator had a meeting regarding the additional site request.   At that meeting, Kazmi confirmed that CareMed did not actually own Apogee, and insisted that Relator not share the purchase agreement with anyone else at CareMed "because that could get us in trouble."

100.    Tyyeb and Kazmi asked whether Relator had told anyone about the agreement, and repeated the instructions not to tell anyone else about the agreement.

101.    As a result of the events of January 27 – 28, 2015, Relator began to seriously question the relationship between CareMed and Apogee.

102.    On January 30, 2015 Mr. Witkowski sent an email to Mike McGuffin, Vice President of Operations, and Relator, among other CareMed employees, indicating that Mr. Witkowski had concerns regarding the relationship between CareMed and Apogee.   Mr. Witkowski suggested that all questions regarding Apogee should likely be directed to Tyyeb and Kazmi.

103.    Shortly thereafter, Relator spoke by phone to Tyyeb on their work landlines. Because of his uncertainty surrounding CareMed's relationship with Apogee, Relator suggested that the request to have Apogee registered as an approved site for limited distribution drugs be run through CareMed's compliance team.   Tyyeb did not directly respond to Relator's concern at that

time.

104.    Instead, later that day, Kazmi approached Relator in person in his office.  Kazmi asked Relator what he was concerned about.  Relator repeated his suggestion that adding Apogee as an approved site should be run through CareMed's compliance team.  He suggested that all such deals should be presented to compliance, particularly because CareMed was operating under a CIA.

105.    Without acknowledging Relator's position or providing further explanation, Kazmi replied that CareMed could not move forward with the request to Pfizer and Genentech to add Apogee as an authorized site to dispense LDDs.

106.    Kazmi then asked Relator to send an email retracting CareMed's request to Pfizer and Genentech.

107.    Kazmi asked whether Relator had made any copies of the documents he had sent to the pharmaceutical companies, including the Apogee purchase agreement.  Relator told Kazmi that he had sent the documents to his personal email.

108.    Kazmi then asked Relator immediately to go into his personal email and delete all traces of Apogee-related emails and documents.  Kazmi stood over Relator's shoulder and watched him delete the documents from his personal email.

109.    When Relator later looked through his work email for other emails from Tyyeb and Kazmi regarding Apogee, he could not find any.  The only email he could find relating to Apogee was from Colby Droubi, an employee at Genentech, forwarding Relator's initial email requesting to add Apogee as an additional site to Jeff Sobolow, the Genentech Account Manager for CareMed.

110.    In Relator's experience, unless deleted, all his emails from his first day in the office were available for his review.

23

111.    Based on this information, Relator believes and therefore alleges that Tyyeb and Kazmi personally deleted or ordered the deletion of all known Apogee-related records from CareMed's servers.

112.    Relator believes that they must have simply missed the email from Ms. Droubi at that time.

113.    Based on this series of events, and future events described below, Relator believes and therefore alleges the following:

a.  Tyyeb and Kazmi wanted to add Apogee as an additional site to ensure they could continue to receive revenue from certain high-value limited distribution drugs for patients covered under the ESI-Medco PBM, including beneficiaries of Government healthcare programs;

b.  Tyyeb and Kazmi went so far as to create a fake purchase agreement to trick pharmaceutical companies into believing that CareMed had purchased Apogee so Apogee could submit claims for those drugs to ESI-Medco;

c.  Tyyeb and Kazmi ordered Relator to send that fake purchase agreement to the drug companies and only relented when Relator questioned the propriety of their actions; and

d.  Tyyeb and Kazmi then engaged in a cover-up to hide their actions.

D.    CareMed entered into an agreement with Apogee to send referrals to Apogee while retaining its customer base and most of the revenues associated with those referrals by offering remuneration in the form of free services to Apogee.

114.    Based on the information in this Complaint, on conversations with other employees, and on logical inferences from Tyyeb and Kazmi's behavior, Relator believes and

therefore alleges the following with respect to CareMed's agreement with Apogee in referring and fulfilling prescriptions that CareMed was no longer authorized to fulfill itself:

      a.  Unknown to Relator at the time, at or about the same time that Tyyeb and Kazmi provided Relator with the fake purchase agreement, CareMed entered into an unlawful agreement with Apogee;

      b.  Under that agreement, CareMed received ESI-Medco prescriptions from its client base, did all the work associated with filling and packaging those prescriptions, and then referred the prescriptions and sent the ready-to-ship pharmaceuticals to Apogee to in turn be sent to patients;

      c.  CareMed may have also paid a cash consideration to Apogee;

      d.  Although under the agreement CareMed did almost all the work, CareMed submitted the claims to ESI-Medco under Apogee's NPI on Apogee's behalf;

      e.  When Apogee received payment from ESI-Medco, Apogee shared that revenue with CareMed;

      f.  Apogee also agreed not to compete for the customers that CareMed referred to Apogee.

115.    Relator learned the above-described contours of this agreement over time by piecing together many different conversations and events, as described below.

116.    At a CareMed operations meeting on February 17, 2015, in the conference room at CareMed's New York office attended by various members of management and the operations team, including Kazmi, Mike McGuffin, Vanessa Mariacher, Relator, Ty Markey, Tim Morin,

Alexis Abella, Lee Joffee (Compliance Officer), Dennis Thomas (Vice President of Operations for Co-Pilot), Blesson Matthews (Compliance Officer), Shikha Lekhi (former Intake Department Supervisor), Ray Chacko (then a Quality Assurance employee), Eddie Guerrero (Assistant Manager of CareMed's Prescription Fulfillment Program Team), Mike Wilson (Assistant Intake Manager), Jennifer Garcia (Accounts Payable), Bincy Varghese, and Corina Deacon (Inside Sales Manager), staff discussed sending prescriptions through Apogee, among other topics.

117.    At the meeting, Mr. McGuffin noted that out of the 507 prescriptions CareMed received on February 9, 2015, "50 of those scripts were sent to Apogee. We will be keeping an eye on the transfer rate to make sure it doesn't go up."

118.    At that same meeting, Mr. Wilson noted that the drug Zytiga could now be filled through Apogee.

119.    Zytiga accounted for over $8.7 million in revenue for CareMed in 2014.

120.    Similarly, Ms. Varghese noted that she was "working on having Trelstar and Affinitor approved to be filled there as well."

121.    Those drugs accounted for over $8 million in revenue for CareMed in 2014. Trelstar in particular had been highly profitable for CareMed up until that time.

122.    Mr. Wilson noted that he wanted a list of drugs that could be filled through Apogee.

123.    Relator thus learned at this meeting that, notwithstanding Tyyeb and Kazmi's decision to retract the request to add Apogee as an additional site and their statements that CareMed did not actually own Apogee, CareMed nevertheless had a significant and potentially growing relationship with Apogee.

124.    At another operations meeting a week later on February 24, 2015 in the same location, attended by management and operations staff, including Moby Kazmi, Mike McGuffin,

26

Vanessa Mariacher, Derek Yee, Ty Markey, Tim Morin, Alexis Abella, Lee Joffee, Dennis Thomas, Bincy Varghese, Shikha Lekhi, Ray Chacko, Eddie Guerrero, Mike Wilson, Jennifer Garcia, and Corina Deacon, staff again openly discussed Apogee and its relationship to CareMed.

125.     Ms. Varghese discussed the number of filled prescriptions at "CareMed, Apogee, and the Florida location."   The "Florida location" was a former Sorkins/CareMed pharmacy incorporated in Florida.  Based on conversations with company insiders, Relator believes that the Florida location closed sometime in 2016.

126.     Ms. Varghese noted that "the numbers for CareMed have been dropping off, Apogee numbers are going up, and the Florida numbers are very low."

127.     Ms. Varghese's language suggested to Relator that Apogee and CareMed were deeply intertwined.

128.     In early 2015, Relator personally saw prescriptions labels printed with Apogee's name at CareMed.

129.     Relator personally saw a particular individual at CareMed's offices on multiple occasions.  Based on conversations with Mr. Witkowski, Relator believes that that individual was at CareMed's offices to pick up Apogee prescriptions by truck and to deliver the prescriptions to Apogee's pharmacy in New Jersey.  The prescriptions were in turn delivered from Apogee's offices to patients, including Government healthcare beneficiaries.

130.     Additionally, CareMed employees, including Erica Carreras, the Clinical Care Coordinator, processed prescriptions on behalf of Apogee, answered Apogee phone calls and handled Apogee orders at CareMed's location in New York.  Ms. Carreras also had access to the CareMed pharmacy software when handling Apogee orders.

131.     Relator was also told by Mr. Witkowski that CareMed had some relationship with

Apogee such that CareMed was filling prescriptions being sent out in Apogee's name.

132.    Also in conversations with Mr. Witkowski, Relator learned of CareMed's early efforts to convince various specialty pharmacies to enter into kickback-induced referral agreements.  Under CareMed's proposed agreement, CareMed would refer prescriptions to the other pharmacy but retain most of the revenues and have a non-compete agreement with the pharmacy for all referrals.  Relator learned from Mr. Witkowski that most other companies rejected the offers.

133.    Through these personal observations and conversations, Relator discovered the agreement between CareMed and Apogee.  Relator determined that Apogee, induced by CareMed and its owners, offered valuable remuneration—namely, a non-compete agreement and a significant portion of the revenues—in exchange for referrals of patients from CareMed.

134.    CareMed induced Apogee to agree by taking prescription orders from its patients with ESI-Medco as their PBM, including Government patients, filling those prescriptions, printing labels, handling the orders, and bringing the filled, packaged, and labeled prescriptions to Apogee for final shipping to the patients.  CareMed may have also made cash consideration to Apogee.

135.    CareMed billed the prescriptions on behalf of Apogee under Apogee's NPI.

136.    CareMed also paid kickbacks to Apogee for future referrals (by inducing Apogee to enter into a non-compete agreement) from patients CareMed initially referred to Apogee in the form of free services to Apogee.

E.    CoPilot facilitated CareMed and Apogee's kickback agreement by redirecting to Apogee prescriptions covered by ESI-Medco that would have been sent to CareMed but for CareMed's exclusion from ESI-Medco.

137.    CoPilot acts as a "hub" for certain prescriptions.  A hub provides various services for specialty pharmaceutical manufacturers, including patient onboarding, benefit verification, patient counseling (often to comply with REMS), and transferring prescriptions to specialty

pharmacies.   These services also include "benefits investigation requests" ("BIRs").   Doctors
submit BIRs for patients to ensure their medications will be covered by the patients' insurance.

138.   CoPilot had agreements to provide such services with, among other companies,
Ferring Pharmaceuticals, which produces Euflexxa and Firmagon.   In 2014, Euflexxa accounted
for more than $3.7 million of CareMed's revenue.

139.   Relator had conversations with Jerry Martinez, a former CoPilot associate manager,
describing the relationship between CoPilot and Apogee.   Similarly, John Witkowski told Relator
about conversations Mr. Witkowski had with Lisa Phauls, a CoPilot employee.   Based on those
conversations, Relator believes and therefore alleges that employees at CoPilot were instructed by
CoPilot management that, while CareMed was excluded from ESI-Medco's network, any BIRs or
prescriptions for ESI-Medco-covered patients were to be redirected to Apogee, without consent
from patient or provider.

140.   Relator further believes and therefore alleges that the instructions to send all
prescriptions for ESI-Medco patients came from Kazmi and Tyyeb, who were directly involved in
managing CoPilot.

141.   By contrast, before CareMed was excluded from ESI-Medco, CoPilot had
transferred prescriptions for patients covered by ESI-Medco to CareMed, without consent from
patient or provider.

142.   Relator also learned from Mr. Martinez that management went even further,
directing that *every* prescription that could possibly be filled at Apogee should be directed to that
pharmacy.

143.   Mr. Witkowski later told Relator that Ms. Phauls confirmed Mr. Martinez's
account.

144.    Based on this information, Relator believes and therefore alleges that Defendants used CoPilot to facilitate the kickback arrangement between CareMed and Apogee.

F.    CareMed caused ESI to submit false claims by filling prescriptions under Apogee's NPI and by filling prescriptions and submitting and/or causing the submission of claims tainted by kickbacks.

145.    Based on his conversations with Mr. Witkowski describing the process by which CareMed submitted claims for payment to ESI-Medco and his personal observations, Relator believes and therefore alleges that CareMed created the electronic claims that were ultimately sent to ESI-Medco under Apogee's NPI.

146.    Mr. Witkowski described to Relator how CareMed's computer system allowed Ms. Carreras to send claims for payment to PBMs alternately under Apogee's NPI or CareMed's NPI. According to Mr. Witkowski, when a prescription was to be paid for by ESI-Medco, CareMed put Apogee's NPI as the fulfilling pharmacy, even though it knew that CareMed had received and filled the order from customers.

147.    As described above, Relator believes that CareMed was only excluded from ESI-Medco.  Relator personally observed how CareMed responded to its exclusion from ESI-Medco, and observed how CareMed and its owners jealously protected CareMed's ability to develop and maintain its own existing or potential sources of revenue.  Based on these beliefs and observations, Relator alleges that CareMed purposefully used Apogee only to fill prescriptions for beneficiaries covered under a Part D plan for which ESI-Medco served as PBM.  For those prescriptions that would be sent to, for example, CVS/Caremark PBM, which had not excluded CareMed, CareMed almost certainly continued to send prescriptions in its own name.

148.    Occasionally, however, Relator believes that CareMed employees made mistakes. Sometimes CareMed employees would submit a prescription claim to ESI-Medco using CareMed's NPI.  In those instances, ESI-Medco would reject the claim.  CareMed would then

quickly resubmit the prescription under Apogee's NPI.

149.    Alternatively, in some other instances CareMed employees accidentally submitted non-ESI-Medco claims under Apogee's name.

150.    Through these actions, CareMed knowingly submitted or caused to be submitted material false information—the NPI of the pharmacy that actually filled the prescriptions—to ESI-Medco, which was acting on behalf of Part D sponsors who in turn were acting on behalf of the Government.  Those prescriptions were then paid for through electronic claims submitted to ESI-Medco.  ESI-Medco, in turn, used the electronic claims data to create PDEs, which were claims used in the Government's payment decisions.  The PDEs were material to the government's decision to pay.  Therefore, CareMed submitted statements material to false claims and caused the submission of false claims to the Government for benefits under the Part D program.

151.    CareMed also submitted or caused Apogee to submit to ESI-Medco claims tainted by kickbacks.  Each referral CareMed sent to Apogee was tainted by kickbacks because, for the reasons described above, they were subject to an agreement that Apogee would not keep any referrals once CareMed was allowed back onto the ESI-Medco network.  In exchange, CareMed performed nearly all the work related to filling prescriptions for referrals it sent to Apogee for shipment to patients.  Apogee also shared the revenue from ESI-Medco for the prescriptions it ultimately sent to patients.

152.    Furthermore, future claims of ESI-Medco patients were similarly tainted by kickbacks because CareMed paid Apogee not to compete for those claims.  This was effectively payment for a referral in violation of the AKS.

G.    CareMed continues to submit false claims to ESI-Medco, which are in turn submitted to the Government for payment.

153.    On information and belief, CareMed was restored to the ESI-Medco network in or

around June 2016.  Relator believes and therefore alleges, however, that CareMed was only able to secure reinstatement by concealing its fraudulent behavior with respect to Apogee.  If ESI-Medco had known of the behavior, it would not have allowed CareMed to rejoin its pharmacy network, and ESI-Medco would not have submitted CareMed's claims after June 2016 to the Government for payment.  Thus, by concealing its fraudulent behavior with respect to Apogee, CareMed tricked ESI-Medco into letting it back into its network and caused ESI-Medco to submit claims to the Government that would not otherwise have been paid.

       H.    <u>CareMed subjected Relator to unlawful retaliation.</u>

154.    On February 3, 2015, Relator entered his CareMed office to discover that someone had left a private investigator's business card on his desk.  The discovery of the business card troubled Relator, especially because he found this card only five days after he had requested that CareMed's compliance function examine the Apogee matter.

155.    Immediately after discovering the business card on his desk, Relator contacted Vanessa Mariacher, CareMed's Director of Human Resources, to ask her if she knew anything about the business card.  Ms. Mariacher told Relator that she had observed Kazmi entering Relator's office from time to time, and said that Kazmi may have left the private investigator's card on Relator's desk.

156.    Relator feared that Defendants were potentially engaged in unlawful conduct and/or were investigating him because he had objected to their conduct.  As part of his efforts to investigate Defendants' misconduct, Relator began to record some of his conversations with Kazmi, Tyyeb, and other CareMed management officials.

157.    Relator met with Kazmi later that day (February 3, 2015).  During this meeting, Kazmi repeatedly told Relator that he must show he was "loyal" to CareMed.  Kazmi then suggested that Relator enter into a written employment agreement with CareMed to demonstrate

his commitment to the company.

158.    By this point in time, Relator had worked for CareMed for nearly seven years without a written agreement detailing his compensation package.  Wanting to formalize his compensation package at CareMed, Relator told Kazmi that he would consider a written employment agreement with CareMed.

159.    Relator again met with Kazmi and Ms. Mariacher later that day (February 3, 2015). Kazmi confirmed to Relator that he (Kazmi) had placed the business card on Relator's desk, and further noted that he had hired private investigators to investigate Relator and others at CareMed. In justifying this action, Kazmi cited Relator's recent conduct and pressed Relator to confirm that he remained "loyal" to CareMed.  Kazmi promised that, if Relator showed his loyalty to CareMed and entered into an employment agreement, Defendants would significantly increase Relator's annual compensation package.

160.    Kazmi's comments and conduct during this meeting suggested to Relator that CareMed's leadership was investigating Relator for having requested that the Apogee matter be submitted to CareMed's compliance function.

161.    On February 15, 2015, Tyyeb presented Relator with a written employment agreement that detailed Relator's compensation package, but also, to Relator's surprise, contained a general release of claims against CareMed and a strict prohibition on Relator's ability to discuss his employment with third parties.

162.    Relator had signed a standard confidentiality agreement with CareMed in March 2013, and feared that Kazmi and Tyyeb were attempting in the new agreement to prevent him from disclosing to government authorities the unlawful arrangement between CareMed and Apogee.

163.    Rather than sign the employment agreement, Relator told Kazmi and Tyyeb that he

(Relator) would need time to review the document.

164.     Over the next four weeks, Kazmi and Tyyeb repeatedly pressured Relator to sign the employment agreement.  During these discussions, Kazmi and Tyyeb warned Relator that his refusal to sign the agreement was allegedly undermining CareMed's business deals.

165.     On March 10, 2015, Relator met with Kazmi and Tyyeb to discuss the employment agreement.  In this meeting, which Relator digitally recorded using his cell phone, Kazmi and Tyyeb spent nearly an hour pressuring Relator to sign the employment agreement.  Kazmi and Tyyeb also questioned Relator extensively about whether he had discussed the Apogee matter with anyone else.  Defendants' conduct reinforced Relator's belief that Defendants knew the Apogee scheme was unlawful and wanted to prevent Relator from disclosing the Apogee matter to government authorities.

166.     At the conclusion of this March 10 meeting, Defendant Tyyeb noticed that a blue LED light was blinking on Relator's Samsung Galaxy phone, and asked Relator to explain the blue blinking light.  The blinking light was a visual indicator that the cell phone was actively recording audio.  Because Relator feared that Defendants would terminate him if they discovered he was recording the conversation, Relator told Tyyeb that the blinking light was an indicator of a new message on his cell phone.

167.     Shortly thereafter, Kazmi and Tyyeb confronted Relator about his cell phone's blinking blue LED light.  They informed Relator that, according to their internet research, a blinking blue LED light indicated that Relator's cell phone had been recording audio.  Kazmi and Tyyeb directed Relator to hand over his personal cell phone so that they could review the phone's contents.  Relator refused.

168.     On March 12, 2015, Relator met with Kazmi and Ms. Mariacher to discuss the

employment agreement.   Caleb DesRosiers, CareMed's General Counsel, participated in the conversation telephonically.

169.   At the outset of this meeting, Relator recapped the concerns he had raised with CareMed over the past several months.   Relator mentioned in this discussion CareMed's recent settlement with the U.S. Department of Justice, its loss of the ESI-Medco contracts, and Defendants' handling of the Apogee matter.   Relator asked Kazmi to explain whether CareMed owned Apogee and to detail why CareMed had deleted the materials relating to the Apogee proof of purchase.   Relator indicated that he believed that Defendants' recent conduct was serious and "scary."

170.   Rather than address Relator's concerns about the Apogee matter, Mr. DesRosiers seized upon Relator's reference to being "scared" by CareMed's handling of the Apogee matter. Mr. DesRosiers said that, because Relator had told CareMed that he was "scared," Relator had to immediately resign his position or be terminated by CareMed.   Mr. DesRosiers also told Relator that, if he had a complaint about the Apogee matter, Relator should "go ahead and file it with the government."   Mr. DesRosiers further stated that Defendants did not care if Relator was recording their conversation.

171.   After Mr. DesRosiers made these remarks, Kazmi told Relator that he (Kazmi) shared Mr. DesRosiers' view that Relator needed to separate from employment with CareMed.

172.   Several minutes later, Tyyeb joined Kazmi in meeting with Relator.   During this follow-up meeting, Kazmi and Tyyeb referred to the Apogee matter in passing but repeatedly refused to disclose any further information about CareMed's handling of the Apogee matter.   Upon repeated questioning by Kazmi and Tyyeb, Relator confirmed to them that he had recorded their conversations because he feared that CareMed had engaged in unlawful conduct.   Kazmi and

Tyyeb urged Relator not to "hurt" CareMed, and orally offered him a severance package of two years of base salary.  Relator briefly discussed the severance offer with Kazmi and Tyyeb but declined to accept it.  Relator instead explained that he would discuss CareMed's severance proposal with his wife.  Relator also reiterated to Kazmi and Tyyeb that he was not resigning his position.

173.    Defendants' conduct at the end of this March 12, 2015 meeting made clear that CareMed terminated Relator as of that date.  At the end of the meeting, Kazmi instructed Relator to leave his CareMed-issued laptop in his office.  Before Relator left the office, Ms. Mariacher searched Relator's personal belongings, and upon confirming that Relator did not possess any CareMed documents, escorted Relator off the premises.

174.    On the following day, March 13, 2015, Relator sent an email to Kazmi, Tyyeb, and Ms. Mariacher, again stating that he had not resigned his position.  Relator further noted in his email that he would contact CareMed about the severance proposal during the following week.

175.    Ms. Mariacher replied to Relator's email by asserting that CareMed accepted Relator's resignation, despite the fact that Relator had unequivocally stated in his email that he was not resigning his position.

176.    Defendants CareMed, Kazmi, and Tyyeb subjected Relator to additional acts of retaliation after his unlawful termination.  Defendants' post-employment retaliation further evidenced Defendants' retaliatory animus against Relator.

177.    On April 7, 2015, CareMed sent a letter to Relator threatening to sue him for purported violations of Relator's March 2013 confidentiality and non-competition agreement.  In support of this threat, CareMed falsely claimed that Relator had violated the March 2013 agreement by launching a competing company called "Network Solutions."  In fact, Relator never

started any such company and he did not otherwise engage in any activities that could be legitimately construed as competing with CareMed's business.

178.    In early May 2015, Relator attended a national trade show in Las Vegas for specialty pharmacies.  Relator attended this trade show to maintain his professional connections and develop potential job opportunities.  Defendant Tyyeb also attended the trade show.  After seeing Relator at the trade show, Defendant Tyyeb contacted the trade show organizers and insisted that the organizers revoke Relator's attendee badges.  Through this conduct, Tyyeb attempted to publicly shame and discredit Relator and damage his chances of securing future employment.

179.    In September 2016, Relator began work for a company called Life Infusions.  On or about November 15, 2016, Defendant Tyyeb telephoned Life Infusions and spoke with Elan Guttman, Owner and President, asking to speak with Relator.  When Guttman contacted Relator about Tyyeb's inquiry, Relator explained to Guttman that he would not be speaking with Tyyeb. That same day, Relator received another call from Mr. DesRosiers.  Relator did not answer this call.  Relator felt that Defendant Tyyeb and CareMed's General Counsel were attempting to contact Relator at the workplace in a further effort to intimidate Relator and interfere with his employment.

180.    Life Infusions terminated Relator's employment several weeks after these phone calls.  Relator believes that Life Infusions terminated him at least in part because of Defendant Tyyeb's call.

181.    Defendants CareMed, Apogee, Kazmi, and Tyyeb's post-termination harassment was not limited to interfering with Relator's employment prospects.  Defendants also engaged in other harassing and intimidating behavior against Relator.

182.    On April 21, 2015, June 4, 2015, and June 8, 2015, Defendant Kazmi sent text

messages to, among others, Defendant Tyyeb, Tynan Markey, John Witkowski, and Relator, making false and defamatory accusations about Relator's conduct as a former CareMed employee. Kazmi sent these messages to intimidate and disparage Relator.

183.    On April 28, 2016, a truck with an "Apogee" sign on its driver-side door arrived at Relator's house.  Two men exited the truck, approached Relator's front door, knocked on the door, and eventually departed when no one answered.  Upon information and belief, Defendants Kazmi and Tyyeb directed these two men to visit Relator at his home as part of Defendants' efforts to intimidate and harass Relator.

184.    Starting on September 26, 2017, and continuing through October 13, 2017, Defendant Tyyeb sent numerous harassing text messages to Relator.  The text messages included false insinuations that Relator was addicted to drugs and used cocaine at work.

185.    Relator is and was not addicted to drugs and did not and does not use cocaine at work.

186.    During that same period Defendant Tyyeb attempted to call Relator on three separate occasions.

187.    Relator believes these texts and attempted calls were meant to further harass and intimidate him, as part of Defendants' retaliatory actions against him.

## COUNT I
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)

188.    Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 187 above as if fully set forth herein.

189.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

190.     Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

191.     Specifically, Defendants caused ESI-Medco to submit false information in its PDEs, which are claims, to the Government.

192.     Defendants falsely and fraudulently submitted claims to ESI-Medco using Apogee's NPI when Defendants knew they should have used CareMed's own NPI.

193.     CareMed, at the direction of Tyyeb and Kazmi, induced Apogee to submit or allow CareMed to submit the claims under Apogee's NPI.

194.     Apogee consented to the false and fraudulent use of its NPI.

195.     ESI-Medco in turn used that information when it submitted PDEs, which are claims, to the federal Government for payment.

196.     Defendants also submitted claims for payment to ESI-Medco, when they knew those claims were tainted by kickbacks.

197.     CareMed, at the direction of Tyyeb and Kazmi, induced Apogee to submit or allow CareMed to submit those claims to ESI-Medco when it knew they were tainted by kickbacks.

198.     CoPilot also participated in the scheme, redirecting ESI-Medco prescriptions that had previously been sent to CareMed to Apogee even though it knew those claims were tainted by kickbacks.

199.     ESI-Medco in turn submitted claims to the Government based on the kickback-tainted claims submitted by Apogee.

200.     Defendants thus caused ESI-Medco to submit false claims to the federal Government.

201.     The Government, unaware of the falsity of the records, statements and claims made

or caused to be made by Defendants, paid the claims that would not be paid but for Defendants' illegal conduct.

202.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

203.     Additionally, the United States is entitled to the maximum penalty of up to $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

**COUNT II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

204.     Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 187 above as if fully set forth herein.

205.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

206.     Specifically, Defendants submitted false NPI information to ESI-Medco.

207.     CareMed, at the direction of Tyyeb and Kazmi, induced Apogee to submit or allow CareMed to falsely submit that Apogee had fulfilled the claims described above by using Apogee's NPI.

208.     Apogee consented to the false and fraudulent use of its NPI.

209.     Because NPI is a crucial part of PDEs that are ultimately submitted to the Government, and by virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false statements or records material to false or fraudulent claims.

210.     Defendants also submitted claims for payment to ESI-Medco that it certified were not tainted by kickbacks, when it knew those claims were tainted by kickbacks.

211.     Those certifications are conditions of payment and material to the Government's ultimate decision to pay the claims.

212.     Thus, by virtue of the acts described above, Defendants knowingly made, used or caused to be made or used, false statements or records material to false or fraudulent claims tainted by kickbacks.

213.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

214.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

215.     Additionally, the United States is entitled to the maximum penalty of up to $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

### COUNT III
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

216.     Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 187 above as if fully set forth herein.

217.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

218.     By virtue of the acts described above, Defendants entered into one or more conspiracies to knowingly present or cause to be presented false or fraudulent claims to the United States Government for payment or approval, and knowingly made, used, or caused to be made or used false statements or records material to false or fraudulent claims.

219.    Apogee and CareMed, at the inducement and direction of Tyyeb and Kazmi, agreed to submit false information to ESI-Medco regarding the NPI of the fulfilling pharmacy and to submit false certifications to ESI-Medco regarding compliance with the AKS.

220.    CoPilot also participated in the scheme, redirecting ESI-Medco prescriptions that had previously been sent to CareMed to Apogee even though it knew those claims were tainted by kickbacks.

221.    Defendants took numerous acts in furtherance of that conspiracy when they undertook the actions described above.

222.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

223.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

224.    Additionally, the United States is entitled to the maximum penalty of up to $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

### COUNT IV
### False Claims Act (Retaliation)
### 31 U.S.C. § 3730(h)

225.    Relator realleges and incorporates by reference the allegations contained in all paragraphs 1 – 187 above as if fully set forth herein.

226.    This is a claim by Relator Yee for Defendant CareMed's unlawful termination of his employment, in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

227.    Defendant CareMed terminated Relator because of lawful acts that Relator

undertook to report and stop what Relator reasonably believed were Defendants' violations of the False Claims Act, as well as lawful acts taken by Relator in furtherance of a possible action for violation of the False Claims Act.

228.    Relator's lawful acts, which 31 U.S.C. § 3730(h) protects from retaliation, include investigating, reporting, and objecting to Defendants' violations of the FCA and AKS.

229.    Defendant CareMed terminated Relator's employment on March 12, 2015, in retaliation for Relator's lawful acts described above in reporting, attempting to stop, and acting in furtherance of other efforts to stop what Relator reasonably believed were actions by Defendants in violation of the FCA.

230.    Defendant CareMed's termination of Relator violated 31 U.S.C. § 3730(h), which prohibits retaliation by employers against employees who investigate or report false statements within the meaning of 31 U.S.C. § 3729.

231.    As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to his reputation and career. Relator is entitled to all relief necessary to make him whole.

## <u>PRAYER</u>

WHEREFORE, Plaintiff-Relator Derek Yee prays for judgment against Defendants as follows:

232.    That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.*;

233.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil

Penalties Inflation Adjustment Act of 1990, for each violation of 31 U.S.C. § 3729;

234.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act;

235.    That the Court enter judgment for Relator and against Defendant CareMed, pursuant to 31 U.S.C. § 3730(h), including an order reinstating Relator to his employment with the full seniority and benefits he would have had, but for his retaliatory discharge, and awarding Relator two times the amount of his back pay;

236.    That the Court award Relator compensatory and special damages in an amount to be proven at trial for the emotional pain and suffering, humiliation, damage to career and loss of enjoyment of life, to the extent permitted by law;

237.    That Relator be awarded all costs of this action, including attorneys' fees, expenses, and post-judgement interest; and

238.    That the United States and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator Derek Yee hereby demands a trial by jury.


Dated:  February _____, 2018


David Jochnowitz
djochnowitz@phillipsandcohen.com
Peter Chatfield
peter@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20036

Tel: (202) 833-4567
Fax: (202) 833-1815

David J. Marshall
Matthew S. Stiff
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
Telephone: (202) 299-1140
Fax: (202) 299-1148
marshall@kmblegal.com
stiff@kmblegal.com

*Attorneys for Plaintiff-Relator*
Derek Yee